**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DON ADDINGTON; JOHN BOSTIC; MARK BURMAN; AFSHIN IRANPOUR; ROGER VELEZ; STEVE WARGOCKI; MICHAEL J. SOHA; RODNEY ALBERT BRACKIN; GEORGE MALIGA, on behalf of themselves and all similarly situated former American West pilots, | No. 14-15757<br><br>D.C. No. 2:13-cv-00471-ROS<br><br>OPINION |
| Plaintiffs - Appellants, | |
| v. | |
| US AIRLINE PILOTS ASSOCIATION; US AIRWAYS, INC., | |
| Defendants - Appellees. | |

| | |
|---|---|
| DON ADDINGTON; JOHN BOSTIC; MARK BURMAN; AFSHIN IRANPOUR; ROGER VELEZ; STEVE WARGOCKI; MICHAEL J. SOHA; RODNEY ALBERT BRACKIN; GEORGE MALIGA, on behalf of themselves and all similarly situated former American West pilots, | No. 14-15874<br><br>D.C. No. 2:13-cv-00471-ROS |
| Plaintiffs - Appellees, | |
| v. | |

US AIRLINE PILOTS ASSOCIATION,

Defendant - Appellant,

And

US AIRWAYS, INC.,

Defendant.

---

DON ADDINGTON; JOHN BOSTIC; MARK BURMAN; AFSHIN IRANPOUR; ROGER VELEZ; STEVE WARGOCKI; MICHAEL J. SOHA; RODNEY ALBERT BRACKIN; GEORGE MALIGA, on behalf of themselves and all similarly situated former American West pilots,

Plaintiffs - Appellees,

v.

US AIRLINE PILOTS ASSOCIATION,

Defendant,

And

US AIRWAYS, INC.,

Defendant - Appellant.

No. 14-15892

D.C. No. 2:13-cv-00471-ROS

Appeals from the United States District Court

2

for the District of Arizona
Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted April 14, 2015
San Francisco, California

Before: TASHIMA, GRABER, and BYBEE, Circuit Judges.

Opinion by Judge Bybee

BYBEE, Circuit Judge:

In 2005, US Airways merged with America West Airlines, setting their respective pilots on a collision course over a single, integrated seniority list. At the time of the merger, the US Airways pilots ("East Pilots") and the America West pilots ("West Pilots") were both represented by the Air Line Pilots Association ("ALPA") as they attempted to negotiate a seniority list. The East Pilots advocated a list based on "date of hire," while the West Pilots advocated a list based on the strength of their pre-merger airline. When these negotiations failed, the dispute went to binding arbitration. The arbitration panel ordered a single list that did not fully accede to the wishes of either group. Unhappy with the result, the more numerous East Pilots forced the decertification of ALPA and the creation of a new union, the US Airline Pilots Association ("USAPA"), that was expressly opposed to the enforcement of the arbitrator's award and openly committed to a seniority list based on date of hire, which favored the East Pilots.

3

This is the second time a dispute over the seniority list has come before us. In the prior case, the West Pilots sued USAPA for a breach of the duty of fair representation. Following both a jury and a bench trial, the district court found a breach and ordered USAPA to negotiate a collective bargaining agreement with US Airways based on the arbitrator's award. In *Addington v. U.S. Airline Pilots Ass'n (Addington I)*, 606 F.3d 1174, 1184 (9th Cir. 2010), we dismissed the West Pilots' duty of fair representation claim as unripe. Five years later, as US Airways completes its merger with American Airlines and their respective pilots—including US Airways' feuding East and West groups—attempt to negotiate a single integrated seniority list, the West Pilots' claim is now ripe for decision. The district court, in a decision it found "hard" and "a very close call," concluded that USAPA did not violate its duty of fair representation to the West Pilots. We reverse.

## I. BACKGROUND

The history of what we have called "a bitter seniority dispute," *Addington I*, 606 F.3d at 1176, is a detailed one, and one that we will set forth with some care.

A.    *2005 US Airways–America West Merger*

1.    The Merger and the Negotiations

4

The dispute between USAPA and the West Pilots arose when America West Airlines and US Airways merged to form a single airline carrier called US Airways. After the formal merger was completed in May 2005, the difficult process of combining day-to-day operations began. At that time, a single collective bargaining representative, ALPA, represented both the East and West Pilots. In September 2005, ALPA and the merging airlines entered into a Transition Agreement that set forth the process for achieving operational integration of the two airlines, including issues of pilot seniority relevant here.

Prior to the merger, the East and West Pilots each had their own separate seniority list and collective bargaining agreement. The Transition Agreement provided for the integration of the seniority lists in accordance with ALPA's Merger Policy, which required the two pilot groups to negotiate an integrated list and, if negotiation failed, to submit to binding arbitration. The Merger Policy stated that any award issued by an arbitration board "shall be final and binding on all parties to the arbitration and shall be defended by ALPA." In either event, the Policy bound the parties to reach a "fair and equitable agreement," keeping in mind five goals: (1) preserving jobs; (2) avoiding windfalls to either group of pilots at the expense of the other; (3) maintaining or improving pilots' pre-merger pay and standard of living; (4) maintaining or improving pilots' pre-merger status; and (5)

minimizing detrimental changes to pilots' career expectations. Once the two sides arrived at an integrated list, the Transition Agreement provided that the list would be submitted to the airline for acceptance, at which point ALPA agreed to "use all reasonable means at its disposal to compel the company to accept and implement the merged seniority list."

The Transition Agreement also provided a timeline for implementing the single seniority list. Specifically, the Agreement stated that the seniority list would be implemented when three things occurred: (1) US Airways obtained a single operating certificate (this occurred in 2007); (2) the two pilot groups created a single seniority list in accordance with the process set forth above; and (3) the pilots and the new airline negotiated a "Single Agreement"—a new collective bargaining agreement—applicable to all pilots. Until that happened, the existing seniority lists and collective bargaining agreements for the respective sets of pilots would remain in place.

Finally, the parties agreed that the Transition Agreement could be modified by written agreement between ALPA and the airline.

Consistent with the procedures set forth in the Transition Agreement, two merger committees—one representing the East Pilots, and one representing the West—entered into negotiations over an integrated seniority list. Several factors

6

complicated the negotiations. The East Pilots were a substantially larger group, consisting of about 5,100 pilots, as compared with 1,900 West Pilots. America West, however, was a newer and financially stronger airline; although its pilots generally had a later hire date, they also enjoyed better wages and greater job security. Most significantly, some 1,700 East Pilots (about one-third of all East Pilots) were on furlough at the time of the merger, while no West Pilots were on furlough. The negotiations, including mediation, failed to generate consensus over a single list, so pursuant to ALPA's Merger Policy, the parties proceeded to binding arbitration.

2.      The Nicolau Arbitration

An arbitration panel, led by George Nicolau, held hearings over the course of eighteen days, from December 2006 to February 2007. In all, the arbitration record included testimony from 20 witnesses, 14 volumes of exhibits, and more than 3,000 pages of hearing transcript. In the arbitration, the East Pilots advocated for a seniority list ordered by date of hire, adjusted for length of service, which ended up pushing most of the West Pilots far down the seniority list and placing a number of furloughed East Pilots above active West Pilots. The West Pilots, on the other hand, advocated for a list based on pilot rank and career prospects, which gave comparatively less weight to length of service.

In May 2007, the arbitration panel issued a careful, 35-page decision known as the "Nicolau Award." The panel, noting that the pilots' respective proposals "differed dramatically," observed that, in such mergers, "[i]t is understandable that universal acceptance is never achieved." The arbitration panel adopted neither proposal in full, instead crafting its award using aspects of both proposals. The Nicolau Award placed about 500 senior East Pilots at the top of the seniority list, explaining that the West Pilots were not operating the widebody international aircraft generally flown by the most senior East Pilots at the time of the merger. It also placed at the bottom of the list the 1,700 East Pilots who were furloughed at the time of the merger, explaining that "merging active pilots with furloughees, despite the length of service of some of the latter, is not at all fair or equitable under any of the stated criteria." The Nicolau Award blended the remainder of the East Pilot list with the West Pilot list.

### 3. Decertification of ALPA/Certification of USAPA

As the district court aptly observed, "[t]o say the East Pilots were not pleased [with the Nicolau Award] is an understatement." As we described in *Addington I*, a majority of the East Pilots "strenuously objected" to the Nicolau Award and immediately set about finding ways to prevent its implementation. 606 F.3d at 1177–78. Initially, the East Pilots tried to convince ALPA to find a way to

8

set aside the Award.  When that failed, the East Pilots filed suit to set aside the Nicolau Award.  ALPA continued to urge the East Pilots to "comply with its representational and legal obligations under the Constitution & Bylaws, ALPA Merger Policy, the Transition Agreement, and implementing resolutions of the Executive Council."  Finally, the East Pilots withdrew their representatives from the committee negotiating a Single Agreement with the airline, effectively bringing those discussions to a standstill.

ALPA subsequently presented the Nicolau Award to the airline for acceptance, consistent with its obligation under the Transition Agreement to "use all reasonable means" to compel the airline to accept the arbitrated seniority list. US Airways accepted the Award a few months later, in December 2007. *Id.* at 1178.

In the meantime, dissatisfied with ALPA's commitment to the Nicolau Award and hoping to prevent the Award from ever going into effect, the East Pilots decided to leave ALPA and form a new union.  They consulted lawyers, who cautioned them that "the language you use in setting up your new union . . . can be used against you.  You need to stress [t]he positives of the new union and not dwell on the award.  Don't give the other side a large body of evidence that the sole reason for the new union is to abrogate an arbitration, the Nicolau award."  The

9

pilots and counsel sought a "roadmap . . . based on the premise that a new bargaining agent can get around the award and make the Nicolau award moot." Ultimately, the East Pilots created USAPA, which adopted a constitution committing it "[t]o maintain[ing] uniform principles of seniority based on date of hire and the perpetuation thereof." In November 2007, the National Mediation Board certified a representation election between ALPA and USAPA. Predictably, because of the number of East Pilots, USAPA won the election and was certified as the collective bargaining representative for all pilots in April 2008.

In September 2008—five months after certification and almost a year *after* the airline accepted the Nicolau Award—USAPA presented a new seniority proposal to US Airways. This proposal ignored the Nicolau Award, instead ordering the pilots according to their date of hire. USAPA's ordering system effectively forced the West Pilots to the bottom of the seniority list, leaving them vulnerable to any furloughs. USAPA made clear that it would never implement the Nicolau Award.

B.      *2008 West Pilot Suit Against USAPA* (Addington I)

That same month, the West Pilots sued in district court, alleging that USAPA had breached its duty of fair representation by proposing a new seniority list instead of pursuing the implementation of the Nicolau Award. After a trial, a

10

jury found that "USAPA had breached its duty by abandoning an arbitrated seniority list in favor of a date-of-hire list solely to benefit one group of pilots at the expense of another." *Addington v. US Airline Pilots Ass'n*, No. CV 08-1633, 2009 WL 2169164, at *1 (D. Ariz. July 17, 2009) (unpublished). The district court then held a bench trial on the remaining equitable issues.

The court found that "USAPA's sole objective in adopting and presenting its seniority proposal to the Airline was to benefit the East Pilots at the expense of the West Pilots, rather than to benefit the bargaining unit as a whole." *Id.* at *6. It reached this conclusion by determining that the terms of the Nicolau Award were final and binding, and thus any amendment USAPA wished to make to that Award required a legitimate union purpose. *Id.* at *10. The court rejected, one by one, each of USAPA's asserted objectives. Among other things, it found no merit to USAPA's claim that a different seniority proposal was necessary to break through the East Pilots' impasse and ratify a new collective bargaining agreement, stating that "any asserted impasse was a pretext for bare favoritism of the East Pilots," and that even if an impasse did exist, "it [was] one that USAPA goaded on" when it "misled the majority about its power to improve their seniority prospects at the expense of the West Pilots." *Id.* at *17–18.

Having found no legitimate union purpose for USAPA's actions, the court entered judgment for the West Pilots and issued an injunction ordering USAPA "to negotiate in good faith for the implementation of the Nicolau Award, defending that Award in negotiations and presenting it with the single new [collective bargaining agreement] to the pilots for ratification vote." *Id.* at *28. It also ordered USAPA "to negotiate for the implementation of the Nicolau Award as part of any single [collective bargaining agreement], unmodified by additional conditions and restrictions USAPA would place upon it." *Id.*

The East Pilots appealed. In *Addington I*, with one judge dissenting, we dismissed the case on ripeness grounds, concluding that the district court did not have jurisdiction to decide the case in the first instance. 606 F.3d at 1179. In so holding, we considered the "fitness of the issues for judicial decision," and the "hardship to the parties of withholding court consideration." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). We concluded that there were many contingencies that could yet "prevent effectuation of USAPA's proposal and the accompanying injury" and that it was "speculative" whether the West Pilots would be harmed by the withholding of decision, because it was unclear whether a collective bargaining agreement implementing the Nicolau Award could be ratified. *Id.* at 1179–80. Observing that our judgment was consistent with our

12

other duty of fair representation cases, "which have found DFR violations based on contract negotiation only after a contract has been agreed upon," we remanded the case to the district court with directions to dismiss. *Id.* at 1181, 1184.

C.     *2010 US Airways Declaratory Judgment Action*

Shortly after we ordered dismissal of *Addington I*, US Airways filed a declaratory judgment action against the West Pilots and USAPA in district court, seeking guidance as to whether it could be held liable for assisting in a breach of USAPA's duty of fair representation if it entered into a collective bargaining agreement that did not implement the Nicolau Award. In the same proceeding, USAPA sought summary judgment on its claim that its date-of-hire seniority proposal did not breach any duty of fair representation. *Id.* The district court made two rulings of note. First, the district court concluded that USAPA was "bound" by the Transition Agreement because USAPA succeeded "to the status of the former representative [ALPA] without alteration in the contract terms" when it became the pilots' new collective bargaining representative. *US Airways, Inc. v. Addington*, No. CV 10-01570, 2012 WL 5996936, at \*4 (D. Ariz. Oct. 11, 2012) (quoting *Int'l Bhd. of Teamsters v. Tex. Int'l Airlines, Inc.*, 717 F.2d 157, 163 (5th Cir. 1983)) (unpublished). At the same time, however, the court noted that, pursuant to the Transition Agreement's own terms, the Agreement "can be

13

modified at any time by written agreement of [USAPA] and [US Airways]." *Id.*

(internal quotation marks omitted).

Second, the district court warned USAPA of the possible consequences of

ignoring the Nicolau Award, and adverted that, "in negotiating for a particular

seniority regime, USAPA must not breach its duty of fair representation":

> [I]f USAPA wishes to abandon the Nicolau Award and accept the consequences of this course of action, it is free to do so. By discarding the result of a valid arbitration and negotiating for a different seniority regime, USAPA is running the risk that it will be sued by the disadvantaged pilots when the new collective bargaining agreement is finalized. An impartial arbitrator's decision regarding an appropriate method of seniority integration is powerful evidence of a fair result. Discarding the Nicolau Award places USAPA on dangerous ground.

*Id.* Citing our decision in *Addington I*, the court rued that it could not "provide as

much guidance as it had hoped it could" because the matter would not be ripe until

there was a collective bargaining agreement. *Id.* at *5. Nevertheless, the court

concluded that "[USAPA's] seniority proposal does not breach its duty of fair

representation provided it is supported by a legitimate union purpose," and granted

partial summary judgment in favor of USAPA. *Id.* No party appealed from that

decision.

## II. THE INSTANT LITIGATION

14

Having reviewed the relevant background, we turn to the proceedings that underlie the present suit.

A.  *2013 US Airways–American Airlines Merger and MOU*

In April 2012, US Airways announced its intention to pursue a merger with American Airlines, following a decision by American Airlines' parent company, AMR Corporation, to commence bankruptcy proceedings.  Soon after, US Airways entered into discussions with the Allied Pilots Association ("APA"), the American Airlines pilots' union, regarding labor contract terms.  Although USAPA was not originally included in the negotiations, US Airways subsequently agreed to include USAPA, which in turn tasked a Negotiating Advisory Committee with representing its pilots at negotiations.  The Committee was comprised of four pilots:  two East Pilots and two West Pilots.

Between late 2012 and early 2013, American Airlines, US Airways, USAPA, and APA negotiated a multi-party agreement called the "Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement" ("MOU").  The MOU sets forth procedures for reaching a Merger Transition Agreement between APA and "New American Airlines," the merged airline, in addition to a Joint Collective Bargaining Agreement to apply to all pilots employed by New American.  Under the MOU, once the Merger Transition Agreement is

15

fully implemented, it will "fully displace and render a nullity any prior collective bargaining agreements applicable to US Airways pilots and any *status quo* arising thereunder."

The MOU also addresses a number of labor-related issues important to the pilots, including terms and conditions of pay, pension and retirement benefits, vacation time, and furlough guarantees. Both parties agree that the MOU contains significant economic benefits for all US Airways pilots, including pay increases. With respect to seniority integration, the MOU provides under Paragraph 10(h):

> US Airways agrees that neither this Memorandum nor the [Joint Collective Bargaining Agreement] shall provide a basis for changing the seniority lists currently in effect at US Airways other than through the process set forth in [the McCaskill-Bond Amendment].

This provision, which did not appear in prior drafts of the MOU, was proposed by USAPA. It incorporates the 2007 McCaskill-Bond Amendment, which sets forth a process by which merging airlines must integrate the seniority of their pilots. *See* 49 U.S.C. § 42112 Note.[1]

The USAPA Board of Pilot Representatives voted to approve the MOU on January 4, 2013. Thereafter, the USAPA Negotiating Advisory Committee

---

[1] We discuss the McCaskill-Bond Amendment *infra* note 5. That statutory process is similar to the process provided for in ALPA's Merger Policy in that it calls for negotiation and, failing agreement, arbitration.

16

embarked on a series of roadshow presentations designed to inform its pilots about the MOU and urge their approval. USAPA, however, tailored its presentation to its divided audiences. When presenting the MOU to the West Pilots, the USAPA representative stated that the MOU was merely "neutral" with respect to seniority. However, when speaking to East Pilots, the representative said that the MOU was beneficial because, in effect, it confirmed that the Nicolau Award was "dead." In a written statement to pilots, USAPA confirmed that under the MOU, the Nicolau Award was dead: "West pilots should not vote in favor of the MOU because they believe it will revive the Nicolau Award, and the East pilots should not vote against it because they are concerned it will cause the Nicolau Award to be implemented." Ultimately, a majority of voting pilots approved the MOU. Of the 1,041 West Pilots who voted, 1,017 voted in favor of the MOU. The MOU was ratified on February 8, 2013.

B.      *District Court Proceedings Below*

In March 2013, shortly after the MOU was ratified, a group of West Pilots filed the present action on behalf of themselves and others similarly situated, bringing several claims against USAPA. In Claim One, the West Pilots alleged that USAPA had breached its duty of fair representation, asserting that "USAPA does not have a legitimate union purpose to use anything other than the Nicolau

Award list to integrate East Pilots and West Pilots." Because the MOU "abandons a duty to treat the Nicolau Award as final and binding," the West Pilots claimed, USAPA breached its duty of fair representation by entering into the MOU. As for a remedy, the West Pilots sought a declaratory judgment that "USAPA is continuing to violate the duty of fair representation by insisting that it will use a date-of-hire seniority list rather than the Nicolau Award list" and an injunction "requiring Defendants to conduct seniority integration according to the MOU procedures but using the seniority order in the Nicolau Award list to order the US Airways pilots."[2]

The district court certified a class of approximately 1,600 West Pilots, held a two-day bench trial in October 2013, and issued a decision in January 2014, in favor of USAPA. The court found that USAPA and its counsel, Pat Szymanski,

---

[2] Claim Two of the West Pilots' complaint alleged that US Airways breached the Transition Agreement. The district court dismissed that claim on the ground that it lacked jurisdiction to hear the claim. Under the Railway Labor Act, federal courts lack subject matter jurisdiction over certain disputes "grounded in the [collective bargaining agreement]." *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 881 (9th Cir. 2002) (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994)). The West Pilots have not appealed the dismissal of this claim. Under Claim Three, the West Pilots sought attorneys' fees under the common benefit doctrine. Finally, contemplating the MOU's Seniority Integration Process set to begin upon the completion of the bankruptcy proceedings involving American Airlines, the West Pilots sought an order under Claim Four declaring that they have "party status" in the integration process and "the right . . . to participate fully (with counsel of their own choice)" in that process.

18

were "motivated in large part simply by a desire to ensure that the Nicolau Award never take effect." *Addington v. US Airline Pilots Ass'n*, No. CV 13-00471, 2014 WL 321349, at *3 (D. Ariz. Jan. 10, 2014) (unpublished).  The court observed that the text of Paragraph 10(h) of the final MOU was amended from USAPA's original proposal, which read:  "This MOU is not intended to nor shall it constitute the 'Single Agreement' referred to in Paragraph VI.A. of the September 23, 2005 Transition Agreement."  The court found that by including Paragraph 10(h), USAPA likely sought to abrogate any duty it had to implement the Nicolau Award:  "While there is no definitive evidence why [Paragraph 10(h)] was included, USAPA likely believed this provision was necessary because completion of a 'Single Agreement' would have triggered obligations under the Transition Agreement, including implementation of the Nicolau Award." *Id.* at *2.  The court then found that, during its roadshow to inform pilots about the purpose and effect of the MOU, "USAPA undoubtedly played fast-and-loose with its members and changed its explanation of Paragraph 10(h) depending on its audience." *Id.* at *7 n.9.  In general, the district court found, the West Pilots voted to ratify the MOU because they "accepted USAPA's oral and written representations that the MOU was neutral." *Id.* at *3.

19

As it had done in the 2012 action, the district court assumed that USAPA had an "existing obligation to use the Nicolau Award." *Id.* at \*6. The question, then, was whether USAPA had "*some* legitimate union purpose" for ignoring the Nicolau Award. *Id.* The court noted that, because no new seniority list had been agreed upon, it could not compare a new list with the list required by the Nicolau Award. In the end, the court concluded that the "increased compensation provisions" in the MOU suggested that "legitimate union objectives motivated *some* aspects of the MOU," although it also found that "USAPA's actions are sufficiently disturbing to make this a very close call." *Id.* at \*5, 7. "The fact that USAPA might have, in truth, been motivated by a desire to weaken the chances of eventual adoption of the Nicolau Award is not enough." *Id.* at \*7. The court expressed hesitation about the West Pilots' plea to examine Paragraph 10(h) in isolation, suggesting that such analysis "may inappropriately enmesh courts in the minutiae of collective bargaining." *Id.* But the court put aside its reservation and went on to reason: "A rational person could conclude that making the MOU explicitly neutral [by including Paragraph 10(h)] served the legitimate union purpose of securing the additional compensation contained in the MOU while putting off to another day the question of the appropriate seniority regime." *Id.* Moreover, the court stated, "USAPA could have rationally decided the neutral

20

provision was necessary to prevent the drag-out fight that surely would have accompanied any non-neutral, seniority-related provision." *Id.* *7 n.8.

The district court entered judgment in favor of USAPA on the duty of fair representation and separate representation claims and a judgment of dismissal without prejudice on the West Pilots' claim for attorneys' fees.[3] *Id.* at *13. In so holding, the court observed that "USAPA avoided liability on the DFR claim by the slimmest of margins and the Court has serious doubts that USAPA will fairly and adequately represent *all* of its members while it remains a certified representative." *Id.* at *12. It "stress[ed]" that it was not holding that USAPA was "free to ignore the Nicolau Award because its members will refuse to ratify anything other than a strict date-of-hire system." *Id.* at *7. "In effect," the court explained, "this is an argument that USAPA is free to treat the West Pilots poorly because that is what the majority of its members wish it to do. That is not the law." *Id.* The district court admonished USAPA that it "cannot justify its actions by

---

[3] The district court also rejected the West Pilots' claimed right to separate representation at the upcoming McCaskill-Bond Seniority List Integration ("SLI") proceedings, concluding that McCaskill-Bond contemplates only that the certified bargaining representative participate in seniority integration proceedings. *Addington*, 2014 WL 321349, at *8–12. As we discuss in the following section, the West Pilots were ultimately offered a seat at the table by APA.

claiming it is merely acting as the conduit for enacting the East Pilots' self-serving wishes." *Id.*

C.      *Seniority List Integration Proceedings*

While the parties were litigating their claims before the district court, the SLI proceedings forged ahead. The National Mediation Board certified APA as the exclusive collective bargaining representative for all pilots involved in the US Airways–American Airlines merger.[4] The merger and reorganization plan became effective on December 9, 2013, triggering the MOU's provision mandating integration pursuant to the McCaskill-Bond Amendment. In accordance with the McCaskill-Bond process, the parties initially attempted to reach agreement through negotiations. When the parties did not reach a negotiated outcome by the agreed-upon deadline, they initiated preparations for arbitration pursuant to Section 13(b) of the Allegheny-Mohawk LPPs.[5]

---

[4] Recall that the APA was the American Airlines' collective bargaining representative prior to the merger. It is no surprise that APA was elected; with nearly 10,000 pilots, APA represents a much larger group of pilots than the East and West Pilots combined.

[5] The McCaskill-Bond Amendment codified two of the labor-protective provisions that the Civil Aeronautics Board imposed in a 1972 merger between Allegheny Airlines and Mohawk Airlines. 49 U.S.C. § 42112 Note; *Allegheny-Mohawk Merger Case*, 59 C.A.B. 19, 45 (1972). These two provisions, Sections 3 and 13, are also known as the "Allegheny-Mohawk LPPs."

(continued...)

As the parties proceeded to arbitration, a dispute arose among USAPA, US Airways, American Airlines, and APA over whether APA possessed the authority to designate additional merger committees to participate in the SLI proceeding.[6] APA had agreed that USAPA could continue to participate in the SLI process even though it no longer constituted the bargaining representative for all the pilots, but APA also wished to designate a separate committee to represent the West Pilots. USAPA disagreed, and, in February 2014, filed a declaratory judgment action seeking to prevent the West Pilots' participation in the SLI process. APA

---

[5](...continued)

Section 3 provides that employees involved in a merger of airlines will have their separate seniority lists combined into a single seniority list covering all employees in a "fair and equitable manner." It further provides that if the parties cannot agree on a fair and equitable manner for combination of the seniority lists, any party may submit the dispute for resolution in accordance with the dispute resolution procedures of Section 13.

Section 13(a) of the Allegheny-Mohawk LPPs establishes a resolution procedure for seniority integration disputes. If a dispute arises, and the parties have not settled the dispute within 20 days, Section 13 provides for a default process for selecting arbitrators and a 90-day timeline for resolving the dispute. Subsection (b) states that the parties may agree on an alternative method for dispute settlement or arbitrator selection, but no party is excused from compliance with the default procedure unless all the parties agree on an alternative.

[6] We take judicial notice of US Airways' 28(j) Letter filed on February 26, 2015, and its accompanying exhibits, the Seniority Integration Protocol Agreement and the January 9, 2015 Preliminary Arbitration Board Award. *See Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts." (citation omitted)).

counterclaimed, seeking a declaration that it had the discretion to establish a new merger committee if it so chose. The parties eventually agreed to a settlement, the terms of which are set forth in the Seniority Integration Protocol Agreement ("Protocol").

Among other things, the Protocol established a Preliminary Arbitration Board to handle disputes regarding the SLI arbitration process. Pursuant to the Protocol, the dispute over whether APA has the authority to designate a separate merger committee for the West Pilots was referred to the Preliminary Arbitration Board. On January 9, 2015, the Preliminary Arbitration Board issued a final Award, concluding that "APA has the discretion to designate a West Pilots Merger Committee to participate in the [S]eniority Integration List (SLI) process, and that it should do so." *In the Matter of the West Pilots' Request for a Merger Committee*, Preliminary Arbitration Board Award at 30 (Jan. 9, 2015). The Board explained that designating such a committee would be "consistent with [APA's] duty of fair representation to all pilot employees," because it would "ensure that the interests of all pilots will be properly represented during the SLI negotiations." *Id.* at 32–33. The Board observed that, "[g]iven the history of intransigence and hostility between USAPA and the West Pilots," in addition to USAPA's constitutional commitment to date-of-hire principles, "it is far from clear that

24

USAPA could or would adequately represent the interests of the West Pilots." *Id.* at 33. Accordingly, the Board concluded that designating a West Pilot Merger Committee would be consistent with McCaskill-Bond's requirement that the SLI process be "fair and equitable" and ordered APA to designate the West Pilot Merger Committee as a full participant in the seniority integration process. *Id.* at 34–35.

The West Pilots acknowledge that the Preliminary Arbitration Board Award granted them separate representation at the arbitration. Thus, the American Airlines Pilots Seniority Integration Committee, the USAPA Merger Committee, and the West Pilots' Merger Committee are each set to participate in the upcoming SLI arbitration. The hearings are scheduled to begin on June 29, 2015, and conclude on October 16, 2015. The SLI Arbitration Board, which has already been selected, is expected to issue an award by December 9, 2015. The parties have agreed to allow a "reasonable extension," if requested by the Board, in the event the Board is unable to meet that deadline. Absent an extension, however, an Award will issue on December 9, resulting in a single seniority list integrating the pilots of American Airlines, US Airways, and the former America West.

## III. THE DUTY OF FAIR REPRESENTATION

With that background, we turn to the issue before us—whether USAPA violated its duty of fair representation to the West Pilots. We note at the outset that, of the many labor issues to which the duty of fair representation applies in the airline industry, pilot seniority is among the most important and the most sensitive. Pilot seniority has been a fertile area for duty of fair representation claims. *See, e.g.*, *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65 (1991); *Humphrey v. Moore*, 375 U.S. 335 (1964); *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992); *Bernard v. Air Line Pilots Ass'n*, 873 F.2d 213 (9th Cir. 1989); *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790 (2d Cir. 1974). Seniority is immensely valuable to pilots; greater seniority means better wages and working conditions. A pilot's position on a seniority list determines her rank, the aircraft she flies, and the control she maintains over her work schedule. Perhaps most important, a pilot's seniority determines her degree of exposure to "furloughs," or unpaid leaves of absence. The most junior pilots at an airline are often the first to be furloughed; seniority can therefore mean the difference between being in or out of a job. *See Humphrey*, 375 U.S. at 346–47. And the issue of seniority is a sensitive one for the union to traverse because a seniority dispute is the equivalent of a family feud over an inheritance: it is a zero-sum game, where moving one pilot up the list necessarily requires moving another pilot down.

26

It is no wonder, then, that this controversy between the West Pilots and USAPA persists through two mergers, numerous negotiations, an arbitration, eight years of litigation, three district court decisions, and now, two decisions in our court. The lengthy and bitter history between the West Pilots and USAPA vividly illustrates the significance of this issue to the parties. Below, we first address the justiciability of the West Pilots' claim before turning to the merits.

A. *Justiciability*

This case is ripe for review. Although we will discuss the duty of fair representation in greater detail in the next section, it is sufficient for us to note here that the duty "applies to all union activity, including contract negotiation." *O'Neill*, 499 U.S. at 67; *see also Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 743 (1988) (the duty of fair representation applies to "challenges leveled not only at a union's contract administration and enforcement efforts, but at its negotiation activities as well" (citation omitted)); *Addington I*, 606 F.3d at 1183 n.8 (the duty "applies both to contract negotiation and contract administration"). The preliminary question is not whether "a union in its negotiating capacity" has a duty of fair representation to its members—it plainly does, *O'Neill*, 499 U.S. at 77—but rather, at what point can unfairly represented members complain to us? In *Addington I*, we concluded that it was when the fruit of negotiations is manifest

27

and some kind of "'final product' has been reached." 606 F.3d at 1182 (quoting *O'Neill*, 499 U.S. at 78).

We believe that a sufficiently "final product" was reached in this case when USAPA negotiated the MOU in 2013 with American Airlines, US Airways, and APA. The MOU supplied a framework—the new ground rules—for entering into a comprehensive collective bargaining agreement for New American Airlines. Obviously, in the merger of American and US Airways, the question of pilot seniority will be a critical component of the efforts to merge the groups of pilots. However, the creation of an integrated seniority list in that merger is complicated by the fact that no single, integrated seniority list has ever emerged from the US Airways–America West merger. In a merger of two airlines, there are presently three seniority lists. That complication is where Paragraph 10(h) of the MOU comes in.

Paragraph 10(h) relieves USAPA of any obligation it had to negotiate with the airlines and APA based on the Nicolau Award. By ensuring that the East and West Pilots' seniority lists will remain separate, while at the same time permitting the McCaskill-Bond seniority integration proceedings to go forward, Paragraph 10(h) effectively ensures that the Nicolau Award will never be implemented under the original US Airways–America West Transition Agreement and the ALPA

28

Merger Policy to which USAPA succeeded. As USAPA reassured the East Pilots, with the adoption of Paragraph 10(h), the Nicolau Award was "dead." Indeed, in its briefing to us, USAPA candidly concedes that it has successfully abrogated the Nicolau Award, acknowledging that Paragraph 10(h) ensures that there will "never be a '[S]ingle [A]greement' as referred to in the Transition Agreement." If there can never be a "Single Agreement," then USAPA will never face the prospect of being compelled, under the legal force of the Transition Agreement, to implement the Nicolau Award. Thus, USAPA's abandonment of the Transition Agreement's process for implementing the Nicolau Award is no longer speculative or contingent; it is a settled fact. The West Pilots' duty of fair representation claim is thus fit for decision.

The second prong of our ripeness inquiry asks whether withholding judicial consideration also works a direct and immediate hardship on the parties. *Addington I*, 606 F.3d at 1179. We think that the answer to this question is also obvious. US Airways is a house divided. After ten years of negotiation, arbitration, and litigation, the US Airways pilots are poised to enter the SLI arbitration process without a single seniority list. Thus, not only must the West Pilots advocate for the seniority interests of US Airways pilots generally in the SLI proceedings, but they must also advocate the Nicolau Award vis-à-vis the date-of-

29

hire seniority scheme that the East Pilots will present. This imposes a double hardship on the West Pilots that they would not otherwise have had to bear if USAPA had observed its duty of fair representation and made a good faith effort to implement the Nicolau Award. It is no answer to say that the SLI Board might, in its discretion, decide to use the Nicolau Award in its eventual integration of the US Airways and American Airlines pilots. Whether or not this possibility comes to pass, the West Pilots presently must endure the direct and immediate hardship of fighting on two fronts.

If the West Pilots are to have any relief, we must grant it before the SLI Award issues. The West Pilots have asked that the East and West Pilots be integrated in accordance with the Nicolau Award in the upcoming SLI proceedings. Their proposed injunction would effectively put the West Pilots in the position they would likely have occupied but for the breach: the US Airways pilots would enter the seniority integration process united behind a single seniority list integrated in accordance with the Nicolau Award. Plaintiffs have therefore alleged an actual "injury as a result of the putatively illegal conduct of the defendant . . . . that is likely to be redressed if the requested relief is granted." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99–100 (1979) (citations omitted). Moreover, it is unclear whether the West Pilots will have any remedy

available once the East, West, and American pilots have been integrated pursuant to the SLI Award. The impending SLI Board decision makes it even more critical that we adjudicate this dispute now.[7]

Plaintiffs' duty of fair representation claim is ripe for adjudication, the requested remedy can ameliorate Plaintiffs' claimed injury, and neither party argues otherwise. Plaintiffs have waited almost eight years for a resolution of their duty of fair representation claim on the merits. We will defer that resolution no longer.

B.    *The Duty of Fair Representation*

---

[7] Having turned the West Pilots away once before in *Addington I*, the dissent would have us bar the door to them entirely. The dissent contends that this appeal is moot because the West Pilots' complaint requested an injunction "requiring Defendants to conduct seniority integration . . . using the seniority order in the Nicolau Award," but USAPA is no longer the exclusive bargaining representative for the US Airways pilots. *See* Dissent at 1–5. Though the merger has stripped USAPA of the legal status it once possessed, such that USAPA cannot violate any duty of fair representation *in the future*, it did not wipe away any harms that USAPA wrought to the West Pilots in the past. Nor does the change in USAPA's status prevent us from granting meaningful injunctive relief to the West Pilots in this case; USAPA continues to enjoy the right to participate in the upcoming SLI arbitration. *See United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) (courts enjoy "considerable discretion in granting injunctive relief and in tailoring . . . relief"). We thus decline to place the West Pilots in the dissent's catch-22: having once rebuffed as unripe the West Pilots' plea to redress USAPA's discriminatory treatment, we will not now deprive them of federal review yet again on the grounds that their claim is moot.

31

We turn, therefore, to the merits of the West Pilots' duty of fair representation claim. Whether a union's conduct amounted to a breach of its duty of fair representation presents a mixed question of law and fact that we review de novo. *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1199 (9th Cir. 1991); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986). We review a district court's findings of fact for clear error. *Woods*, 925 F.2d at 1199; *see Jones v. Union Pac. R.R. Co.*, 968 F.2d 937, 941–42 (9th Cir. 1992). We conclude, for the reasons discussed below, that USAPA breached its duty of fair representation to the West Pilots.

1.      USAPA has breached its duty of fair representation

At its most rudimentary level, the union's duty of fair representation is a duty "to make an honest effort to serve the interests of all, . . . without hostility to any." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337 (1953). The principle was first articulated in *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192 (1944), a case with a troubled history not unlike the case before us. Bester Steele, the appellant in that case, was a fireman who worked for the Louisville & Nashville Railroad. 323 U.S. at 194. As a black man, Steele was excluded by "constitution and ritual" from the Brotherhood of Locomotive Firemen and Enginemen, the exclusive bargaining representative chosen by the white majority of firemen

32

employed by the Railroad. *Id.* at 194–95. The Brotherhood notified the Railroad that it intended to amend the existing collective bargaining agreement "in such manner as ultimately to exclude all Negro firemen from the service." *Id.* at 195. Under the amended agreement, Steele and several other black men were "disqualified" from their position in a "passenger pool," a highly desirable assignment, then replaced by four white men—all junior in seniority to Steele and no more competent—and finally, assigned to "more arduous, longer, and less remunerative work in local freight service." *Id.* at 196. Steele sued the Brotherhood under the Railway Labor Act—the act under which the Brotherhood's authority as exclusive bargaining representative arose.

The Supreme Court concluded that the Railway Labor Act imposes on the bargaining representative of a class of employees "the duty to exercise fairly the power conferred upon it [o]n behalf of all those for whom it acts, without hostile discrimination against them." *Id.* at 203. The Court observed that the Act requires carriers to bargain exclusively with the representative chosen by the employees and no other, and that "[t]he minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own." *Id.* at 200. Thus, the Court reasoned, unless the union owes some duty to represent the minority members of the group, "the minority would be left

33

with no means of protecting their interests." *Id.* at 201. Accordingly, the Court held: "So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft." *Id.* at 204.

While *Steele* firmly established the nondiscrimination principle of the duty of fair representation, the precise contours of that duty are not clear. In other areas of the law where there is a general duty of nondiscrimination with respect to employment, such as equal protection or Title VII, we have well-developed tests and procedures for identifying unlawful discrimination. In those contexts, however, the duty runs to individuals, or classes of individuals sharing a common characteristic, such as race, gender, age, or disability. The duty of fair representation in the union context is quite distinct because of the collective nature of the union-employer relationship. A union must act in the general interest of its membership, and it may have to compromise on positions that will inevitably favor a majority of its members at the expense of other of its members. *See Humphrey*, 375 U.S. at 349–50 ("Conflict between employees represented by the same union is a recurring fact."); *Ford Motor Co.*, 345 U.S. at 338 ("The complete satisfaction of all who are represented is hardly to be expected."); *Rakestraw*, 981 F.2d at 1530

("Bargaining has winners and losers."); *Hendricks v. Airline Pilots Ass'n*, 696 F.2d 673, 677–78 (9th Cir. 1983). Such a winners-and-losers compromise does not mean that the union has violated its duty of fair representation.

The Court has struggled to describe the legal relationship between a union and its members. In *Air Line Pilots Ass'n v. O'Neill*, the Court observed that members of the Court have variously described the duty as analogous to a fiduciary duty that a trustee owes the trust beneficiaries, or the relationship between attorney and client, or the duty of care and loyalty owed shareholders by corporate officers and directors. 499 U.S. at 74–75. In *O'Neill* itself, the Court resorted to the language of equal protection. *Id.* at 81 ("A rational compromise . . . was not invidious 'discrimination' of the kind prohibited by the duty of fair representation."). The best statement of the duty appears in *Vaca v. Sipes*: "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." 386 U.S. 171, 177 (1967). Or, as we have expressed it, "[w]e may decline to give a union the deference owed to an exercise of judgment only where union actions or inactions are 'so far outside a wide range of reasonableness that [they are] wholly irrational or arbitrary.'"

35

*Beck v. United Food & Commercial Workers Union*, 506 F.3d 874, 879 (9th Cir.

2007) (second alteration in original) (quoting *O'Neill*, 499 U.S. at 78).

Accordingly, "[t]o establish that the union's exercise of judgment was

discriminatory, a plaintiff must adduce 'substantial evidence of discrimination that

is intentional, severe, and unrelated to legitimate union objectives.'" *Id.* at 880

(quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge*,

403 U.S. 274, 301 (1971)).

The negotiation of seniority lists presents a particularly difficult application

of the union's duty of fair representation. For the reasons we have previously

discussed, the creation of a seniority list is inevitably an exercise in winners and

losers. We must respect the "wide latitude" that unions need for "the effective

performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78.

Accordingly, obtaining employee benefits or minimizing risks to employees

constitutes a legitimate purpose for making seniority-related concessions. *See*

*Baker v. Newspaper & Graphic Commc'ns Union*, 628 F.2d 156, 166 (D.C. Cir.

1980) (concluding that a union did not breach its duty of fair representation where

it capitulated to the employer's proposed seniority regime, necessary to keep the

company afloat, concluding that "the loss of work for some . . . [was] preferable to

job losses for all"). Achieving stability and strengthening organized labor also

constitute legitimate union purposes. *See Rakestraw*, 981 F.2d at 1534–35 (finding no breach where a union drafted the seniority roster to effectively punish pilots who had "crossed the picket lines" and thereby "strengthen the hand of organized labor in future conflicts with management").

So, what constitutes such "arbitrary conduct" on the part of the union? For starters, we have made clear that the union's duty to avoid "invidious" discrimination extends beyond such factors as "race or other constitutionally protected categories," explaining that "these grounds are too restrictive." *Simo v. Union of Needletrades*, 322 F.3d 602, 618–19 (9th Cir. 2003). In the context of negotiating a seniority list, the prohibition on arbitrariness means that "a union may not juggle the seniority roster for no reason other than to advance one group of employees over another." *Rakestraw*, 981 F.2d at 1535; *see Ramey v. Dist. 141*, 378 F.3d 269, 277 (2d Cir. 2004) (upholding a finding of violation of the duty of fair representation where union stripped seniority from pilots who favored a different union). We have thus found that a union breached its duty of fair representation when it failed to follow its own policies in merging the seniority lists of two groups of airline pilots, the effect of which was to punish the pilots who were not unionized prior to the merger. *Bernard*, 873 F.2d at 217. Other courts have found a breach where the union assigned seniority based on longevity

37

in the union, *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 613 (1st Cir. 1987); favored union members over non-union members of the bargaining unit, *Jones*, 495 F.2d at 797; made seniority promises to advance the career of union officials, *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 799 (7th Cir. 1976); or made seniority promises to one group of employees to secure election, *Truck Drivers, Local Union 568 v. NLRB*, 379 F.2d 137, 143 (D.C. Cir. 1967). In short, a union must act with some legitimate union purpose that "rationally promote[s] the *aggregate welfare* of employees in the bargaining unit." *Rakestraw*, 981 F.2d at 1535 (emphasis added). Decisions benefitting a majority of the group may not be made merely because the "losers ha[d] too few votes to affect the outcome of an intra-union election." *Id.* at 1530.

Two cases analogous to ours illustrate these principles. The first of these is *Barton Brands, Ltd. v. NLRB*. In that case, Barton Brands acquired Glencoe Distilling Company. 529 F.2d at 795. The employees of both companies agreed to dovetail their seniority lists, and the union bargained for such a list with Barton. *Id.* at 795–96. When Barton did not build a new facility as planned, it was forced to lay off some of its employees. *Id.* at 796. The pre-acquisition Barton employees sought to "endtail" the former Glencoe employees, who they saw as taking positions from the pre-acquisition Barton employees. *Id.* During the collective

38

bargaining agreement negotiations, the union and the employer agreed to recalculate the seniority of the former Glencoe employees and consider their seniority only from the date of acquisition; this had the effect of moving the Glencoe employees below all of the pre-acquisition Barton employees. *Id.* The Seventh Circuit found that the union violated its duty of fair representation to the former Glencoe employees:

> [T]he Union acted solely on grounds of political expediency in reducing the former Glencoe employees' seniority. . . . [S]uch decisions may not be made *solely* for the benefit of a stronger, more politically favored group over a minority group.

*Id.* at 798–99 (citation omitted). The court remanded to the NLRB to "consider that in order to be absolved of liability[,] the Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority." *Id.* at 800.

The second case is our decision in *Bernard v. Air Line Pilots Ass'n.* In that case, Alaska Airlines and Jet America Airlines were merging their operations. 873 F.2d at 214. The Alaska Airlines pilots were represented by ALPA; the Jet America pilots were not represented by a union. ALPA entered into negotiations with Alaska Airlines over integrating the Jet America and Alaska pilots. Alaska Airlines refused to allow the Jet America pilots to participate in the negotiations.

39

*Id.* at 215. When the airlines and ALPA entered into an agreement that favored the Alaska pilots, the Jet America pilots alleged that ALPA had violated its duty of fair representation. *Id.* at 214–15. We concluded that ALPA had violated its duty to fairly represent all members of the bargaining unit. In particular, we pointed to the fact that "ALPA failed to follow its own merger policy for mergers with ALPA-represented groups. This policy would have required ALPA to conduct internal negotiations with Jet America pilots, and mediate and arbitrate if necessary, before presenting its position to management." *Id.* at 216. Effectively, ALPA "discriminate[d] against the Jet America pilots because they were not unionized prior to the merger." *Id.* at 217.

In the end, applying these principles here, we do not think that this is a difficult case. From its inception, USAPA has advocated for date-of-hire principles as a way of suppressing the minority, the West Pilots. In another context, a date-of-hire preference would be a perfectly rational means of ordering a seniority list, *see McNamara-Blad v. Ass'n of Prof'l Flight Attendants*, 275 F.3d 1165, 1172 (9th Cir. 2002); *Laturner v. Burlington N., Inc.*, 501 F.2d 593, 599 (9th Cir. 1974), but here it was a raw exercise of political power to undo the process to which the East and West Pilots had agreed. In effect, USAPA promised a date-of-hire regime as the quid pro quo for securing the East Pilots' vote on their new

bargaining unit, and it treated the West Pilots as though they were non-union members.

Under the Transition Agreement's seniority-integration process, the two groups of pilots were committed to working out a single, integrated seniority list through ALPA's Merger Policy. That Merger Policy provided a familiar, neutral set of rules for resolving such explosive issues. Even though neither side knew what the outcome of the game would be, both sides knew what the rules were. Both East and West Pilots had a full and fair opportunity to advocate for the advantages of their favored seniority regime. Negotiation, mediation, arbitration—all well-established dispute-resolution mechanisms—were brought to bear in the East and West Pilots' seniority dispute. In the end, neither side could agree on a method for integrating the two lists, and the matter went to arbitration. The result was the Nicolau Award, which did not embrace in full the position of either side. ALPA was obligated to defend that Award in its collective bargaining negotiations with US Airways.

Yet, when all was said and done, the East Pilots repudiated their promise to be bound by the outcome of the agreed-upon process. When the East Pilots did not get the outcome they wanted, they simply dumped the rules and found a new rulemaker—USAPA—that they could control. By "constitutionally committ[ing

USAPA] to pursuing date-of-hire principles," *Addington I*, 606 F.3d at 1177, the East Pilots fixed the game.

From the outset, USAPA was irreconcilably opposed to the negotiating position of the West Pilots. Conceived in the minds of the East Pilots, elected and installed by the East Pilots, and constitutionally committed to a date-of-hire list that favored the East Pilots, USAPA could never fairly and impartially represent the West Pilots. The very reason for its existence was to undermine the Nicolau Award in every manner that ALPA had refused to do. USAPA was, for all intents and purposes, a representative for the East Pilots. This purpose is nowhere more evident than in the East Pilots' and USAPA's own words. In the East Pilots' consultations with counsel, they sought to develop a roadmap for creating "a new bargaining agent [that] can get around the award and make the Nicolau Award moot." And although counsel cautioned the East Pilots to take care not to advertise too broadly that the "sole reason for the new union" was to abrogate the Nicolau Award, the East Pilots paid little heed. Their new union's constitution spoke its founders' purpose loud and clear. USAPA's constitution committed it "to maintain[ing] uniform principles of seniority based on date of hire." This principle flatly contradicted the Nicolau Award, but it ensured that the East Pilots, whose voting strength overpowered the West Pilots by more than two-to-one, would vote

42

to certify USAPA as the new collective bargaining representative. And upon its certification, USAPA's first act was to submit a new seniority list to US Airways, consistent with the date-of-hire principles it was constitutionally committed to proselytize.

Although in *Addington I* we were uncertain about how the East and West Pilots' "internal disputes" would eventually "work themselves out," 606 F.3d at 1181 n.4, USAPA's subsequent actions have rendered the picture clear. Since USAPA's initial act of proposing a revised seniority list in 2008, it has continued to oppose any efforts to reach a "Single Agreement," the consummation of which would automatically trigger the implementation of the Nicolau Award under the terms of the Transition Agreement. Thus far, USAPA has been fully successful. Two years after we decided *Addington I*, when US Airways and American Airlines announced their merger, there was still no Single Agreement and no Nicolau Award. USAPA succeeded in keeping separate the seniority lists applicable to the East and West Pilots until it finally had the opportunity, in the US Airways–American Airlines merger, to dismantle the Nicolau Award for good. In short, USAPA's aim to benefit the East Pilots at the expense of the West Pilots is no longer in any doubt.

There is another, independent reason why USAPA's genetic commitment to a date-of-hire principle violates its duty of fair representation. USAPA did not just follow ALPA in time; it succeeded to ALPA's duties under the Transition Agreement. That union-management Transition Agreement provided that once ALPA's Merger Policy resulted in an integrated list, the union was obligated to submit it to US Airways and to "use all reasonable means at its disposal to compel the company to accept and implement the merged seniority list." As the district court found in the 2012 proceedings, "[w]hen USAPA became the pilots' new collective bargaining representative, it succeeded 'to the status of the former representative without alteration in the contract terms.'" *US Airways*, 2012 WL 5996936, at *4 (quoting *Int'l Bhd. of Teamsters*, 717 F.2d at 163). "Thus, just as ALPA would have been bound by the Transition Agreement had it remained the pilots' representative, USAPA is bound by the Transition Agreement." *Id.* The court observed that the Transition Agreement could still be modified by agreement of the union and US Airways, but it warned USAPA that if it abandoned the Nicolau Award it would be "on dangerous ground." *Id.*

When the West Pilots brought this case to the district court, the court again assumed that USAPA had breached its duty of fair representation if it abandoned its "obligation" to the Nicolau Award without some "legitimate union purpose."

44

*Id.* at \*5. The union claimed that Paragraph 10(h) of the MOU satisfied that purpose, and the district court reluctantly agreed. We thus turn to Paragraph 10(h) of the MOU.

2. Paragraph 10(h) did not serve a legitimate union purpose

The merger with American Airlines presented USAPA with a dilemma. On the one hand, it offered USAPA an opportunity to obtain a host of lucrative benefits for all its pilots through its negotiation of the MOU. On the other hand, the MOU threatened to become the "Single Agreement" that USAPA had fought for years to avoid. Ultimately, USAPA agreed to the MOU, but not without inserting a provision making clear that its assent to the MOU would not "provide a basis for changing the seniority lists currently in effect at US Airways." Paragraph 10(h) therefore maintained in-place the separate seniority lists for the East and West Pilots that persisted at US Airways. The West Pilots contend that USAPA breached its duty of fair representation when it included Paragraph 10(h) in the MOU. As the plaintiffs, the West Pilots bear the burden to demonstrate "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Beck*, 506 F.3d at 880 (internal quotation marks omitted). For the reasons discussed below, we conclude that the West Pilots have

met their burden and that Paragraph 10(h) of the MOU represents yet another example of USAPA's continuing discrimination against the West Pilots.

Here, the district court identified three reasons why USAPA may have included Paragraph 10(h) in the MOU. First, the district court found, USAPA used Paragraph 10(h) to make the MOU "explicitly neutral" and "put[] off to another day the question of the appropriate seniority regime," while securing, in exchange, "the additional compensation contained in the MOU." Second, the court suggested that USAPA viewed Paragraph 10(h) as "necessary to prevent the drag-out fight that surely would have accompanied any non-neutral, seniority-related provision." And finally, the district court found that USAPA likely believed that Paragraph 10(h) was necessary to prevent completion of a "Single Agreement," triggering implementation of the Nicolau Award. We address each finding in turn.

First, we address the district court's conclusion that USAPA's motive for including Paragraph 10(h) was to render the MOU "explicitly neutral" so as to secure the benefits contained in the MOU. Had there been any evidence to suggest that USAPA included Paragraph 10(h) for the purpose of obtaining benefits under the agreement, then USAPA's actions would clearly be legitimate. *See Baker*, 628 F.2d at 166. Certainly, obtaining salary increases, retirement benefits, and pension benefits is as legitimate a purpose as obtaining greater job security. *See id.* The

46

problem, however, is that the district court did not point to a single piece of evidence supporting its conclusion. Whereas the record in *Baker* clearly showed that a particular seniority regime was a "major bargaining goal" for the company as it was necessary to keep the company afloat, *see id.* at 159, the district court below pointed to no evidence suggesting that the airline insisted on Paragraph 10(h) in exchange for the benefits it was offering.

Moreover, there is no apparent reason why the airlines would value this asserted concession. While seniority holds enormous consequence to individual pilots, the record fails to show that New American has any interest in whether one pilot is senior to another, or vice versa. It is no surprise, then, that although US Airways and American wished to integrate their respective pilots in accordance with the new McCaskill-Bond Amendment, as required by law, there is no evidence that the airlines had any stake in the substantive outcome of the seniority integration. Here, there is no rational justification in the record to support the conclusion that USAPA decided to put off the seniority discussion to garner benefits for the pilots under the MOU.[8] Because we are left with "a definite and

_____

[8] USAPA's view—that the mere presence of contractual benefits suffices to discharge a union's duty of fair representation—would permit unions to insulate any discriminatory action by embedding it within a contract which nominally provides benefits, even if there is no rational connection between the benefits and

(continued...)

firm conviction that a mistake has been made," we conclude that the district court's contrary finding is clearly erroneous. *See Woods*, 925 F.2d at 1199 (internal quotation marks omitted).

Second, the district court concluded that Paragraph 10(h) may have been inserted into the MOU to prevent a "drag-out fight that surely would have accompanied" any provision purporting to affect seniority. This conclusion is unsupportable. It may be perfectly legitimate, in the abstract, for a union to take measures to avoid infighting while negotiating a contract with an employer. But conflict avoidance cannot serve as a legitimate union purpose where the conflict results from the unilateral, discriminatory action of the union itself. In other words, the union cannot claim that it is avoiding intra-union conflict by negotiating a position that clearly favors one side in the intra-union dispute. That is not conflict avoidance; it is using the negotiations as an excuse for conflict resolution. As we explained above, USAPA was constitutionally committed to repudiating the Nicolau Award and thus diametrically opposed to the interests of its West Pilot members. Thus, accepting the avoidance of the fight between USAPA and the West Pilots as a legitimate purpose for including Paragraph 10(h) merely blesses

---

[8](...continued)
the discriminatory action. Such a rule proves too much.

USAPA's discriminatory conduct against the West Pilots. USAPA may not point to a conflict of its own, unjustified creation to bootstrap its way to a legitimate union purpose.[9]

Having set aside two of the district court's proposed motives for implementing Paragraph 10(h), we are left with the court's final set of findings. The district court found that USAPA likely included Paragraph 10(h) to ensure that the Nicolau Award never took effect. This conclusion finds ample support in the record.[10] But we respectfully disagree with the district court and the dissent

_____

[9] The dissent contends that "[e]ven if USAPA had some role in perpetuating the seniority controversy by not resolving it sooner," we must focus our attention on the facts and circumstances confronting USAPA at the time it decided to include Paragraph 10(h) in the MOU, which included the "very real conflict that existed at the time the MOU was being negotiated." Dissent at 14. The dissent's narrow view of the scope of our review threatens to eliminate meaningful judicial review entirely. The history and context of a union's actions is critical to understanding its motives. Contrary to the dissent's view that Paragraph 10(h) was neutral, reflecting USAPA's "decision to walk a middle road," Dissent at 10–13, we conclude that the history of this case makes clear that it was anything but.

[10] The record showed that Mr. Szymanski "was motivated in large part simply by a desire to ensure the Nicolau Award never take effect" and that USAPA believed that Paragraph 10(h) was necessary to prevent the MOU from "trigger[ing] obligations under the Transition Agreement, including implementation of the Nicolau Award." *Addington*, 2014 WL 321349, at *2–3.
In its final order, the district court took USAPA to task for its dilatory tactics: "USAPA employed almost every conceivable delaying tactic," including extensive filings and motions to continue. *Id.* at *5. Delay worked to USAPA's benefit. The longer it could postpone its obligations to negotiate for the Nicolau

(continued...)

49

regarding the inference to be drawn from this fact. Far from demonstrating that the union had a *legitimate* purpose in negotiating Paragraph 10(h), the paragraph is further evidence of USAPA's intransigence and its continuous course of discriminatory conduct. USAPA's motive is nowhere more evident than in its behavior during the MOU roadshows where, as the district court found, USAPA's representatives told the East Pilots that Paragraph 10(h) rendered the Nicolau Award "dead," but also "played fast-and-loose" with the West Pilots, deceiving them about the purpose and effect of Paragraph 10(h).[11] USAPA included Paragraph 10(h) solely to benefit the East Pilots over the West Pilots, to free them from the consequences of the arbitration to which they were bound. USAPA's conduct is blatantly discriminatory. Such a decision falls outside the "wide range

---

[10](...continued)
Award, the more likely it was that the West Pilots would give in or that the matter would become moot.

[11] We could not agree more with the dissent that reversal of the district court's factual determinations requires a finding of clear error. But far from "ignor[ing]" evidence that the majority of the West Pilots voted to ratify the MOU, which the dissent contends we have done, *see* Dissent at 15 n.5, we have clearly acknowledged it. *See supra* Part II.A. Rather, it is the dissent that draws an inference from the facts that the district court did not; while the dissent contends that "the fact that West Pilots overwhelmingly ratified the MOU suggests that USAPA was not simply abandoning their interests," Dissent at 13, the district court found that the West Pilots voted in favor of the MOU because, "[i]n general, the West Pilots accepted USAPA's oral and written representations that the MOU was neutral." *See Addington*, 2014 WL 321349, at *3.

of reasonableness" that we afford the union because USAPA has violated its duty of "complete loyalty to[] the interests of all whom it represents." *Ford Motor Co.*, 345 U.S. at 338; *see Barton Brands*, 529 F.2d at 798–99.

In sum, the district court identified three possible reasons why USAPA included Paragraph 10(h) in the MOU: first, to obtain the benefits of the MOU while remaining neutral as to seniority; second, to avoid conflict; and third, to advantage the East Pilots by promoting date-of-hire seniority over the Nicolau Award. The first reason is unsupported by the evidence, and the district court clearly erred in concluding that this reason could have supported USAPA's actions. The second reason is not legitimate; USAPA may not rely upon an unjustified conflict of its own making as a legitimate union purpose. And the third reason is clearly discriminatory and impermissible. None of the purposes that the district court identified for USAPA's actions constitutes a "legitimate union purpose" for abandoning the Nicolau Award in the MOU. Nor do we see any other legitimate union purpose for Paragraph 10(h).

Our disagreement with the district court is not fundamental, however, but merely marginal. The district court acknowledged that this case presented a "very close call" and that USAPA avoided liability only by the "slimmest of margins." *Addington*, 2014 WL 321349, at *5, *12. We conclude that once USAPA assumed

51

the duty to act as statutory representative for all the pilots, it could not rightly refuse to represent all the pilots' interests fairly and impartially. Because it did so openly, we find that USAPA violated the most elementary principle of the duty of fair representation—to serve the interests of all of its members, not just the pilots who voted for the union.

## IV. REMEDY

In *Steele*, the Supreme Court explained that a "representative which . . . discriminates [among members] may be enjoined from so doing." 323 U.S. at 203. Thus, in duty of fair representation cases, we can fashion an injunction where it will either prevent the unjustly benefited employee from "taking the benefit of such discriminatory action," *see id.*, or "make the injured employee whole," *see Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 49 (1979) (citing *Steele*, 323 U.S. at 206–07). In crafting equitable relief for the West Pilots, our task is to determine how the parties would have fared but for USAPA's breach.

Because APA has taken its place as the exclusive bargaining representative for all the pilots who will become part of New American Airlines, USAPA no longer maintains its former position. In an ordinary case, that would mean the end of USAPA's representative authority. *See McNamara-Blad*, 275 F.3d at 1170 ("[A] labor organization that is not the exclusive representative of a bargaining

52

unit . . . owes no duty of fair representation to the members of the unit." (internal quotation marks omitted)).  In this case, however, APA authorized USAPA to participate in the upcoming SLI arbitration under APA's discretionary authority as the designated collective bargaining representative.  Likely recognizing that USAPA represents only the interests of the East Pilots, APA sought and obtained permission from the Preliminary Arbitration Board to designate a separate West Pilots Merger Committee to represent the interests of the West Pilots.  Thus, even though USAPA no longer enjoys the statutory status of the exclusive bargaining representative, USAPA continues to have a place at the bargaining table where it may formally oppose the West Pilots Merger Committee and advocate for its favored seniority regime.

The harm resulting from USAPA's violation is the persisting *absence* of an integrated seniority list.  Permitting USAPA to go forward in the SLI arbitration process effectively ratifies USAPA's past violations of its duty of fair representation.  It allows USAPA to take advantage of the absence of an integrated list—the direct result of its own misconduct—to advocate a brand new list unfettered by its obligations under the ALPA Merger Policy and Transition Agreement.  We cannot countenance such a result.  Nevertheless, we also recognize that it is not certain whether the Nicolau Award would have been

implemented fully but for USAPA's breach. Because a good faith attempt to implement the Nicolau Award would have ultimately required a ratification vote by all the pilots, and we cannot know what the results of such a vote would have been, we can never be certain whether efforts to implement the Nicolau Award through a collective bargaining agreement with US Airways would have succeeded. *See Addington I*, 606 F.3d at 1179.

We conclude that injunctive relief is necessary and appropriate in this case to prevent the East Pilots from continuing to enjoy the benefits of USAPA's breach at the expense of the West Pilots. Although there remains some ambiguity over whether the Nicolau Award would have been adopted *in toto*, to conclude, as does the dissent, that the West Pilots may not obtain any relief at all is to grant USAPA the benefit of doubt that USAPA itself created. We thus remand this case with instructions to the district court to enter an order enjoining USAPA from participating in the McCaskill-Bond seniority integration proceedings, including any seniority-related discussions leading up to those proceedings, except to the extent that USAPA advocates the Nicolau Award.[12]  *See Bernard*, 873 F.2d at

---

[12]  We decline to order the issuance of the West Pilots' requested injunction "that an unmodified Nicolau Award must be used to order the seniority of the East and West pilots in the pending McCaskill-Bond process." Although we have approved injunctions against nonparties, *see SEC v. Wencke*, 622 F.2d 1363, 1370

(continued...)

54

217–18 (affirming preliminary injunction compelling a union to negotiate a new integrated seniority agreement in accordance with its own internal procedures). This remedy adequately accounts for our uncertainty over whether the Nicolau Award would have been implemented because it allows for the possibility that the SLI arbitration panel might not ultimately use the Nicolau Award in its final integration of the US Airways and American Airlines Pilots. It also limits USAPA's participation in the seniority integration proceedings, but does not prohibit USAPA from advocating the seniority position of the East and West Pilots, collectively, as against the American Airlines pilots. Nor is USAPA barred from participating, to the extent it is otherwise permitted, in negotiations regarding other labor matters. At the same time, our injunction has the benefit of alleviating the West Pilots' hardship of fighting on two fronts and ensuring that the East Pilots cannot exploit the benefits of USAPA's breach any longer.

## V. CONCLUSION

Since *Steele*, "the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca*, 386 U.S. at 182. USAPA

---

[12](...continued)
(9th Cir. 1980), we decline to do so here, where USAPA is a party to this suit and enjoining it alone will provide effective relief to the West Pilots.

has served as the stalking horse for the East Pilots' exclusive interests and left the West Pilots bereft of representation. USAPA's manifest disregard for the interests of the West Pilots and its discriminatory conduct towards them constitutes a clear breach of duty. Accordingly, we reverse the district court's conclusion that USAPA did not breach its duty of fair representation and remand with instructions to enjoin USAPA from participating in the McCaskill-Bond proceedings except to the extent that USAPA will advocate the Nicolau Award. On remand, the district court should consider the West Pilots' claim for attorneys' fees.

We vacate as moot the portion of the district court's decision denying the Plaintiffs separate representation in the McCaskill-Bond proceedings, with instructions to dismiss. *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950); *see Camreta v. Greene*, 131 S. Ct. 2020, 2036 & n.11 (2011) (vacating only a portion of the lower court's judgment). The Preliminary Arbitration Board's order granted the West Pilots separate representation in the SLI arbitration.[13] Thus, the West Pilots have obtained the remedy they sought and

---

[13] USAPA contends that Plaintiffs' own conduct rendered this claim moot, making vacatur inappropriate in this case. To the contrary, the Preliminary Arbitration Board granted the West Pilots relief, thus rendering the West Pilots' claim moot "due to circumstances unattributable to any of the parties." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 22–26 (1994) (quoting *Karcher v. May*, 484 U.S. 72, 82, 83 (1987)). Vacatur is appropriate under such

(continued...)

56

"there is nothing for us to remedy, even if we were disposed to do so." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

Finally, we dismiss USAPA and US Airways' cross-appeals for failure to present an argument. Fed. R. App. P. 28(a)(8). The judgment of the district court is

**REVERSED in part, VACATED in part, and REMANDED.** Costs on appeal are awarded to Plaintiffs-Appellants.

---

[13](...continued)
circumstances.

**Counsel**

Marty Harper (argued), Marty Harper, PLLC, Phoenix, Arizona; Andrew S. Jacob and Jennifer Axel, Polsinelli P.C., Phoenix, Arizona, for Plaintiffs-Appellants.

Patrick Szymanski (argued), Washington, D.C.; Brian J. O'Dwyer and Joy K. Mele, O'Dwyer & Bernstien, LLP, New York, New York; Susan Martin and Jennifer Kroll, Martin & Bonnett, P.L.L.C., Phoenix, Arizona, for Defendant-Appellee-Cross-Appellant.

Robert A. Siegel (argued) and Chris A. Hollinger, O'Melveny & Myers LLP, Los Angeles, California; Karen Gillen, US Airways, Inc., Tempe, Arizona, for Intervenor-Cross-Appellant.

FILED

JUN 26 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Plaintiffs' McCaskill-Bond claim is moot and that the portion of the district court's decision addressing that issue should be vacated with instructions to dismiss that claim. I also agree that USAPA's and US Airways' cross-appeals should be dismissed. I believe, however, contrary to the majority, that Plaintiffs' breach of the duty of fair representation claim should also be dismissed as moot. I, thus, would not reach the merits of that claim. If we do reach the merits, I disagree with the majority's determination that USAPA breached its duty of fair representation. Moreover, even assuming USAPA breached its duty of fair representation, the misdirected injunction the majority imposes is erroneous and an abuse of discretion in view of the fact that USAPA is no longer a certified bargaining representative and, therefore, is not subject to the Railway Labor Act and can no longer be yoked with a duty of fair representation.

Accordingly, I dissent from Parts III, IV, and V of the majority opinion, except for those portions of Part V that address Plaintiffs McCaskill-Bond claim and the cross-appeals.

**I.**

To see how the duty of fair representation claim has become moot, one need

only peruse the allegations of Plaintiffs' First Amended Complaint ("FAC") that relate directly to their claim that USAPA breached the duty of fair representation. First, in their opening, introductory paragraph, Plaintiffs allege that they "file this complaint to enjoin Defendants from integrating the pilot operations in a manner that breaches Defendant USAPA's duty of fair representation." Then, 12 pages later, under "Claim One: Breach of the Duty of Fair Representation," the FAC alleges:

97. Pursuant to the duty of fair representation, USAPA must have a legitimate union purpose to use anything other than the Nicolau Award list to integrate East Pilots and West Pilots.

98. USAPA does not have a legitimate union purpose to use anything other than the Nicolau Award list to integrate East Pilots and West Pilots.

99. USAPA, therefore, breached the duty of fair representation by entering into the MOU because the MOU abandons a duty to treat the Nicolau Award as final binding.

100. Plaintiffs are entitled to a declaratory judgment to that effect and to other remedy sought below.

The only injunctive relief sought in Plaintiffs' Prayer for Relief is:

136. An injunction requiring Defendants to conduct seniority

2

integration according to the MOU procedures but using the seniority order in the Nicolau Award list to order the US Airways pilots.

All of the allegations of the duty of fair representation claim are directed *solely* to the use of the "Nicolau Award to integrate East Pilots and West Pilots." But USAPA can no longer "conduct seniority integration" because it has been overtaken by the US Airways/American Airlines merger, and conduct of the seniority integration proceedings is now the responsibility of APA, the bargaining agent for *all* pilots of new American Airlines, including both East and West Pilots.

To understand what it means to conduct seniority integration, we need look no further than the statute that governs seniority integration in airline mergers, the McCaskill-Bond Amendment to the Federal Aviation Act. McCaskill-Bond, which incorporates labor-protective rules established by the now-defunct Civil Aeronautics Board, requires unions and carriers to make "provisions . . . for the integration of seniority lists in a fair and equitable manner." *Allegheny-Mohawk Merger*, 59 C.A.B. 19, 45 (1972), *incorporated by statute*, 49 U.S.C. § 42112 Note. These provisions may include arranging for both negotiation and, if necessary, arbitration. *Id.*

When the West Pilots first brought this action, USAPA was still a certified union and thus had statutory authority under McCaskill-Bond to make

3

arrangements for how the seniority integration would be conducted. As laid out in their FAC, the West Pilots sought an injunction forcing USAPA to arrange seniority integration in a specific way: by merging the Nicolau Award and the American Airlines seniority list. The predicate of this claim was that using any list other than the Nicolau Award to order the US Airways pilots would be a breach of USAPA's duty of fair representation.

That option is now off the table. Because USAPA has since been decertified as a labor representative, it has no statutory authority to change or control how seniority integration will be conducted; only APA and the new American Airlines have that power. An injunction issued against USAPA cannot change the seniority integration procedure. Accordingly, the relief that the West Pilots actually sought in this action against their then-union can no longer be granted, rendering the case moot. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc) (stating that a case is moot if "changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief" (quoting *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 n.4 (9th Cir.2000))).

The fact that the Seniority Integration Protocol Agreement (the "Protocol") allows for a USAPA-delegated "merger committee" to present a position in the

4

McCaskill-Bond arbitration does not save this case from mootness. The role of USAPA's merger committee is legally and functionally distinct from the former role of USAPA as a union. As discussed above, the statutory role of a union is actually to conduct seniority integration, and the already agreed-upon Protocol lays out how that integration will be conducted. Under the terms of the Protocol, the USAPA-delegated merger committee may present an argument, but it cannot control the process or product of seniority integration.

The FAC did not seek an injunction addressing the merger committee or limiting what arguments the committee could present to the arbitrators. Nor could it have. The FAC was predicated entirely on USAPA's duty of fair representation to the West Pilots, a duty which, by virtue of its decertification, it no longer has. *See Dycus v. NLRB*, 615 F.2d 820, 827 (9th Cir. 1980) ("A labor organization that is not the exclusive representative of a bargaining unit . . . owes no duty of fair representation to the members of the unit."). No longer being the certified bargaining agent, USAPA is in no position "to conduct seniority integration" using the Nicolau Award or any other list. It also no longer is able to breach the duty of fair representation because it is no longer bound by such a duty. For these reasons, Plaintiffs' duty of fair representation claim has become moot and should be dismissed.

5

**II.**

With respect to the merits of the duty of fair representation claim, the majority brushes aside the district court's careful findings of fact, made after a full trial, and orders a misdirected injunction that has little connection to the issues in this case, or to the relief requested in Plaintiffs' FAC, an injunction that exceeds the circumscribed role that we as a federal court may play in national labor disputes.

In view of the deference this court owes to USAPA as the then-certified bargaining representative, and to the district court as finder of fact, I would affirm the district court's finding that USAPA did not breach its duty of fair representation. Given the different constituencies a union must represent, and the impossibility of pleasing them all, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). Noting the broad scope of discretion allotted to unions, the Supreme Court has repeatedly "analogized a union's role to that of a legislature," subject to similarly limited judicial review. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991); *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 198 (1944); *see Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1532 (7th Cir. 1992) ("*O'Neill* analogized the union's choice

6

to that of a legislature, subject to the most deferential judicial review."). Although the actions a union may take are limited by the duty of fair representation it owes to each of its members, "[t]his duty is narrowly construed by the courts . . . so that unions may act freely in what they perceive are the best interests of their members generally." *Jones v. Union Pac. R.R. Co.*, 968 F.2d 937, 941 (9th Cir. 1992). Like the majority, I recognize that "[i]n the context of negotiating a seniority list, the prohibition on arbitrariness means that 'a union may not juggle the seniority roster for no reason other than to advance one group of employees over another.'" Maj. Op. at 38 (quoting *Rakestraw*, 981 F.2d at 1535). In other words, it is not the existence of an illegitimate motive that turns a union action into a violation of the duty of fair representation. It is, instead, *the absence of any* legitimate motive.

After a full bench trial on the merits, the district court determined that, although USAPA clearly had some improper motives, it was also motivated by at least one legitimate purpose: "securing the additional compensation contained in the MOU while putting off to another day the question of the appropriate seniority regime." Securing additional compensation is a legitimate union purpose. *See* Maj. Op. at 47 (citing *Baker v. Newspaper & Graphic Commc'ns Union, Local 6*, 628 F.2d 156, 166 (D.C. Cir. 1980)). A determination of motive constitutes a finding of fact by the district court, which we may overturn only if it is clearly

7

erroneous. *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1199 (9th Cir. 1991).

Even under this deferential standard of review, the majority writes off the district court's findings as clearly erroneous because "the district court did not point to a single piece of evidence supporting its conclusion" that "USAPA included Paragraph 10(h) for the purpose of obtaining benefits under the agreement." Maj. Op. at 47. I strongly disagree.

Under the "clearly erroneous" standard, we must "defer to the lower court's determination unless, based on the *entire evidence*, we are possessed of a 'definite and firm conviction that a mistake has been committed.'" *SEC v. Rubera*, 350 F.3d 1084, 1093 (9th Cir. 2003) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis added)). "So long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous." *Id.* at 1093-94. Thus, our duty does not end with the opinion of the district court; we must review the entire evidentiary record before overturning a factual finding with which we may disagree.

## A.

The majority mischaracterizes what the district court found to be USAPA's legitimate motive for including Paragraph 10(h) in the MOU. Contrary to the majority's assertions, USAPA never claimed that Paragraph 10(h) was intended as

8

a *quid pro quo* concession to extract additional compensation from American Airlines, and the district court never said it was. *See* Maj. Op. at 47-48. What the district court actually found was that Paragraph 10(h) was intended to prevent an *internal* struggle within USAPA's membership, which could have jeopardized or delayed the ratification of the MOU and the additional compensation it offered. While USAPA was able to negotiate the MOU, it did not act with a free hand; the agreement would not become binding until ratified by the union's membership. Thus, the majority is mistaken in treating securing additional compensation and preventing a "drag-out fight" as two separate justifications for USAPA's action. They are two sides of the same coin: USAPA could not secure additional compensation for its employees if it could not get the MOU ratified, and it could not get the MOU ratified if the MOU implicated the seniority issues that had divided USAPA's membership since 2007. There is ample evidence in the record to support the district court's finding that USAPA feared that the benefits of the MOU might be jeopardized by implicating pilot seniority.[1]

---

[1] What matters is not whether or not USAPA *could* have received additional compensation without the need for Paragraph 10(h); what matters is whether USAPA, in exercising its judgment, actually believed Paragraph 10(h) would help forestall a fight that could endanger or delay the increased compensation. It is not the place of the courts to second-guess a union's exercise of judgment. *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007).

9

The first place this motive is apparent is the language of Paragraph 10(h) itself. Contrary to the majority's claims, Paragraph 10(h) did not "clearly favor[] one side in the intra-union dispute," Maj. Op. at 49, or "relieve[] USAPA of any obligation it had to negotiate with the airlines and APA based on the Nicolau Award," *id.* at 29. What the East Pilots have wanted all along is not two seniority lists, but a single seniority list based on date of hire. The West Pilots, meanwhile, wanted the Nicolau Award without any modification. Paragraph 10(h) gave neither side what it wanted. In explicitly disclaiming any effect on pilot seniority, the MOU was, as the district court found, "explicitly neutral." That finding is not clearly erroneous. In the coming McCaskill-Bond proceedings, the East Pilots would still have to convince an arbitration panel to abandon the Nicolau Award if they were ever to get the date-of-hire seniority regime they wanted. And if USAPA had remained the certified bargaining representative of US Airways' pilots, it would still have been bound by the Nicolau Award to the same extent it was bound before the MOU was ratified.[2] It is USAPA's decertification as the

---

[2] The majority fails to explain exactly what obligation USAPA had "to negotiate with the airlines and APA based on the Nicolau Award," or how Paragraph 10(h) removes that obligation. Maj. Op. at 29. The last time this case was before us, we noted that "USAPA [was] at least as free to abandon the Nicolau Award as was its predecessor, ALPA." *Addington v. U.S. Airline Pilots Ass'n* (*Addington I*), 606 F.3d 1174, 1181 (9th Cir. 2010). Nothing in Paragraph 10(h) – or the entire MOU for that matter – claims to supersede the prior Transition

10

exclusive bargaining agent of the US Airways pilots, not Paragraph 10(h), that has relieved it of its duty to the West Pilots.

Had USAPA been truly opportunistic, it might have tried to include a provision in the MOU calling for date-of-hire seniority. Instead, Paragraph 10(h) ensured that the MOU gave neither the East Pilots nor the West Pilots what they wanted in terms of seniority, but gave both what they wanted in terms of compensation. USAPA's decision to walk a middle road between the desires of the East and West Pilots strongly supports the district court's finding that it acted in part from a desire to "rationally promote the aggregate welfare of employees in the bargaining unit." *Rakestraw*, 981 F.2d at 1535.

The background against which the MOU was negotiated also supports the district court's finding that Paragraph 10(h) was intended to be neutral in order to ensure the MOU could be ratified. The East Pilot's hostility to the Nicolau Award was well known; it was how USAPA came to exist in the first place. Had the East Pilots feared the MOU would trigger the Nicolau Award, they would likely have fought the MOU and USAPA, just as they fought ALPA in 2007.[3] And USAPA's

---

Agreement or the Nicolau Award. Thus, whatever duty USAPA inherited from ALPA with respect to integrating the East and West pilots survived the MOU, and now, presumably, rests with APA.

[3] We previously recognized the unlikelihood that the East Pilots would ever ratify an agreement supporting the Nicolau Award, even if it were proposed

11

Board of Pilot Representatives had already rejected a previous version of the MOU proposed by USAPA's Negotiating Advisory Committee, indicating that those negotiating the MOU could not take approval for granted.

Finally, the district court's finding that Paragraph 10(h) was meant to prevent a counter-productive fight finds support in the way in which the MOU was negotiated. The majority paints USAPA as a puppet of the East Pilots, scheming to advance their interests while "treat[ing] the West Pilots as though they were non-union members." Maj. Op. at 41. In reality, USAPA delegated the negotiation of the MOU to a Negotiating Advisory Committee comprised of four union members, two of who were West Pilots and the remaining two East Pilots. When the MOU was put to a ratification vote, the West Pilots supported it in even greater numbers than the union at large: 75% of the total ballots cast favored ratification, but among the West Pilots, 97.69% of those who voted favored ratification. Although none of the Negotiating Advisory Committee members testified as to the specific reason for including Paragraph 10(h), the fact that half of its members were West

_____

by USAPA. *See Addington I*, 606 F.3d at 1180 ("ALPA had been unable to broker a compromise between the two pilot groups, and the East Pilots had expressed their intentions not to ratify a CBA containing the Nicolau Award. Thus, even under the district court's injunction mandating USAPA to pursue the Nicolau Award, it is uncertain that the West Pilots' preferred seniority system ever would be effectuated.").

Pilots lends support to the district court's finding that Paragraph 10(h) was not a naked power grab by the East Pilots. And the fact that West Pilots overwhelmingly ratified the MOU suggests that USAPA was not simply abandoning their interests. *Cf. Gullickson v. Sw. Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996) ("Legal authority holds . . . that ratification of a seniority arrangement is a valid defense to complaints about a union's actions in making that arrangement.").

**B.**

The majority disregards USAPA's legitimate fears about a ratification fight, reasoning that "USAPA may not point to a conflict of its own, unjustified creation to bootstrap its way to a legitimate union purpose." Maj. Op. at 49. But the conflict over seniority is plainly not USAPA's creation. The fight began in 2005 when US Airways and America West merged, and their pilots could not agree on a single, integrated seniority regime. It escalated in 2007 when an arbitration panel announced the Nicolau Award, satisfying the West Pilots but not the East Pilots. It was only after these events that a group of East Pilots decided to create USAPA to replace ALPA as their union. USAPA did not create the conflict; it inherited the conflict, just as APA has now inherited the conflict. USAPA is not the East Pilots. Had USAPA's leadership decided to support the Nicolau Award, they had every

13

reason to believe they would have been voted out like ALPA before them.[4] The conflict over seniority was a very real problem within USAPA's membership, and it was not a problem USAPA created or could control.

Even if USAPA had some role in perpetuating the seniority controversy by not resolving it sooner, there is simply no support for the proposition that a union cannot justify its actions by referencing conditions it created. Instead, it is our duty to "evaluat[e] the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators *at the time the decision was made*." *O'Neill*, 499 U.S. at 78 (emphasis added). The only decision at issue in this case is the decision to include Paragraph 10(h) in the MOU. No law required USAPA to ignore the very real conflict that existed at the time the MOU was being negotiated.

In short, there is ample evidence to support the district court's finding that USAPA acted, in part, from a legitimate motive when it negotiated to include Paragraph 10(h) in the MOU. In holding that the district court's findings of fact were clearly erroneous, the majority mischaracterizes the district court's decision and ignores the real threat that a ratification fight would have erupted if USAPA's members believed the MOU would trigger an obligation to implement the Nicolau Award. Whatever faults USAPA might have, its decision not to link the MOU and

---

[4]    *See* note 3, *supra*.

14

the Nicolau Award was not "wholly irrational." *Id.* (internal quotation marks

omitted). On that ground alone, we should affirm.[5]

### III.

After erroneously rejecting the district court's well-supported factual

findings, the majority goes on to order an injunction that is entirely

disproportionate to – and untethered from – any relief requested in Plaintiffs' FAC,

any injury to the West Pilots, and in total disregard of USAPA's current decertified

status. "Injunctive relief is an extraordinary remedy and must be tailored to

remedy the specific harm alleged." *McCormack v. Hiedeman*, 694 F.3d 1004,

1019 (9th Cir. 2012) (internal quotation marks and citations omitted). "The

Supreme Court has cautioned that 'injunctive relief should be no more burdensome

to the defendant than necessary to provide complete relief to the plaintiffs.'" *Id.*

(quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). An injunction that

forbids some future act is not an appropriate remedy "unless 'there exists some

---

[5] The majority states, "Contrary to the dissent's view that Paragraph 10(h) was neutral, reflecting USAPA's 'decision to walk a middle road,' we conclude that the history of this makes clear that it was anything but." Maj. Op. at 50 n.9. While I concede that, were the majority the fact finder, the record plausibly supports such a finding, the issue is whether the district court clearly erred in finding otherwise. It did not. Among the evidence the majority ignores is that the West Pilots voted to approve the MOU, including Paragraph 10(h), almost unanimously – by a 97.69% favorable vote.

15

cognizable danger of recurrent violation.'" *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854 (9th Cir. 1995) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

## A.

## 1.

Here, as the majority recognizes, USAPA can no longer violate the duty of fair representation because it no longer has such a duty. *See* Maj. Op. at 53 ("[A] labor organization that is not the exclusive representative of a bargaining unit . . . owes no duty of fair representation to the members of the unit." (quoting *McNamara-Blad v. Ass'n of Prof'l Flight Attendants*, 275 F.3d 1165, 1170 (9th Cir. 2002)) (alterations in original)). Thus, the underlying basis for requesting injunctive relief to prevent future breaches of the duty of fair representation has been completely undercut: USAPA is no longer a certified bargaining representative under the Railway Labor Act. "The scope of the duty of fair representation is generally coextensive with the scope of the union's statutory authority as the exclusive bargaining agent." *McNamara-Blad*, 275 F.3d at 1169. "A labor organization that is not the exclusive representative of a bargaining unit . . . owes no duty of fair representation to the members of the unit." *Dycus*, 615 F.2d at 827. Nothing USAPA does in the McCaskill-Bond arbitration can violate a duty

16

of fair representation because USAPA no longer owes such a duty to the West Pilots, the East Pilots, or anyone else.

The majority acknowledges that "[i]n an *ordinary* case," USAPA's decertification "would mean the end of [its] representative authority." Maj. Op. at 53 (emphasis added). Nonetheless, the majority implies that this is an extraordinary case in which a labor organization's duty somehow survives its decertification as a union. In doing so, the majority cites no legal authority to suggest that a union's duty can ever extend beyond its certification as a bargaining representative under the Railway Labor Act or the National Labor Relations Act. Indeed, no authority supports that position.

Rather, binding precedent makes it clear that the mere fact that USAPA has been invited to participate in the McCaskill-Bond arbitration *does not* resuscitate its duty of fair representation. Although judicially crafted, the duty of fair representation is a "statutory obligation" that stems from the "statutory authority to represent all members of a designated unit" under the National Labor Relations Act or the Railway Labor Act. *Diaz v. Int'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007). "[T]he duty of fair representation is inextricably linked to the union's status as exclusive bargaining representative in the collective bargaining process or in the administration of rights under a

17

collective bargaining agreement." *Simo v. Union of Needletrades, Indus. & Textile Employees, Sw. Dist. Council*, 322 F.3d 602, 614 (9th Cir. 2003) (quoting *Felice v. Sever*, 985 F.2d 1221, 1228 (3d Cir. 1993)).  Although USAPA may still be active in the McCaskill-Bond proceedings, it is not the statutory exclusive bargaining representative of any pilots; that position is now held by APA.  Moreover, USAPA has no right to participate "in the collective bargaining process or in the administration of rights under a collective bargaining agreement." *Id.* (quoting *Felice*, 985 F.2d at 1228).  Because USAPA can commit no further breaches of the duty of fair representation, there exists no "cognizable danger of recurrent violation," and the majority's injunction cannot be justified as preventing future harm.  *Laerdal Mfg. Corp.*, 73 F.3d at 854 (quoting *W. T. Grant Co.*, 345 U.S. at 633).  The majority has not cited a single case in which an affirmative injunctive duty was imposed on a certified bargaining agent *after* that agent had been decertified.

## 2.

Likewise, the majority's injunction cannot be justified as undoing a previous breach of the duty of fair representation.  Any injunctive relief "must be tailored to remedy the specific harm alleged." *McCormack*, 694 F.3d at 1019 (quoting *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir.

18

2011)).  There is no caselaw relaxing this requirement in the context of labor disputes.

The only duty of fair representation claim raised in the West Pilots' FAC was that USAPA breached its duty of fair representation by entering into an MOU containing Paragraph 10(h).  Any injunctive relief must therefore be crafted to remedy only the "specific harm" caused by that discrete union action.  *Id.* (quoting *Park Vill. Apartments Tenants Ass'n*, 636 F.3d at 1160).  On the record before us, however, it is impossible to identify any specific harm suffered by the West Pilots that is clearly traceable to Paragraph 10(h).  We cannot know whether the MOU would have been ratified without Paragraph 10(h), though history suggests that it would not have been.  If the East Pilots had prevented ratification, the West Pilots would be worse off than they are now because there would still be two seniority lists, but they would not have received the additional compensation contained in the MOU.[6]

The majority fails to resolve the absence of a remediable harm.  In fact, the

---

[6]    It is also speculative whether an MOU not containing Paragraph 10(h) would have required USAPA to implement the Nicolau Award at all.  The West Pilot's contention is that, but for Paragraph 10(h), the MOU would have triggered a duty to implement the Nicolau Award stemming the Transition Agreement executed during the US Airways-America West merger.  Thus, deciding what effect the MOU would have had absent Paragraph 10(h) requires interpreting the Transition Agreement, an analysis which the majority fails to undertake.

19

majority desperately flails about in its attempt to identify a discrete injury traceable to Paragraph 10(h). It first states that "[t]he harm resulting from USAPA's violation is the persisting *absence* of an integrated seniority list." Maj. Op. at 53 (emphasis in original). But that, of course, is not the harm Plaintiffs complain they have suffered. The *only* harm Plaintiffs complain about is the absence of an integrated seniority list *reflecting the Nicolau Award*. The majority does not address *this harm*. The reason it doesn't address it is because it concedes that there is no such traceable injury:

> [W]e also recognize that it is not certain whether the Nicolau Award would have been implemented fully but for USAPA's breach. Because a good faith attempt to implement the Nicolau Award would have ultimately required a ratification vote by all pilots, and we cannot know what the results of such a vote would have been, we can *never be certain* whether efforts to implement the Nicolau Award through a collective bargaining agreement with US Airways would have succeeded.

*Id.* at 53-54 (emphasis added). In one breath, the majority claims that the harm to be remedied is the absence of a seniority list, a harm about which Plaintiffs have not complained, and in the next, it admits that it cannot, in any event, trace the absence of such a seniority list to USAPA's actions. This is a virtual admission that there is no continuing harm traceable to USAPA's breach of the duty of fair representation to be remedied by an injunction. In the absence of any clear and identifiable injury to the West Pilots, it is impossible to craft a properly tailored

20

injunction. The majority's resort to injunctive relief to remedy a speculative (and likely imagined) harm is inappropriate.[7]

## B.

Even if the majority were correct to afford injunctive relief, the specific injunction the majority orders is inappropriately broad and goes well beyond what would be required of USAPA even if it were still the certified bargaining representative for the US Airways Pilots. Because "[a]n injunction should be 'tailored to eliminate only the specific harm alleged,'" *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992)), we have repeatedly warned district courts that an "overbroad" injunction is an abuse of discretion, *see, e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013); *McCormack*, 694 F.3d at 1019; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). As discussed above, it is far from clear on the record that there is in fact an injury to be remedied through an injunction or, for that matter, what exactly the majority believes is the injury to be remedied.

---

[7] Recall also that we have previously observed that "even under [an] injunction mandating USAPA to pursue the Nicolau award, it is uncertain that the West Pilots' preferred seniority system ever would be effectuated." *Addington* I, 606 F.3d at1180.

The majority "conclude[s] that injunctive relief is necessary and appropriate in this case to prevent the East Pilots from continuing to enjoy the benefits of USAPA's breach at the expense of the West Pilots." Maj. Op. at 54. But the majority never tells us what those "benefits" are. The only "benefit" and the only assertion that USAPA breached its duty of fair representation, would be in the makeup of the pilot seniority list. *But that list has never been drawn up.* The majority appears to recognize as much, continuing, "Although there remains some ambiguity over whether the Nicolau Award would have been adopted *in toto*, to conclude, as does the dissent, that the West Pilots may not obtain any relief at all is to grant USAPA the benefit of doubt that USAPA itself created." *Id.* But my purpose is not "to grant USAPA the benefit of doubt," but to grant it to the district court's findings of fact, as the clearly erroneous standard of review requires. Just as important, I would grant that benefit to the McCaskill-Bond pilot seniority integration proceeding so that the arbitration board can conduct a proceeding of its own design.

While the majority leaves the exact text of an injunctive order for the district court to decide on remand, its instructions will require the district court to issue an overbroad injunction. The majority directs the district court "to enter an order enjoining USAPA from participating in the McCaskill-Bond seniority integration

22

proceedings, including any seniority-related discussions leading up to those proceedings, except to the extent that USAPA advocates the Nicolau Award." Maj. Op. at 54-55. Put differently, USAPA will have only one task: advocating the Nicolau Award.

This remedy bears no relation to the purported harm. Even if the Nicolau Award had been implemented, USAPA would still be free to advocate for any seniority regime: because USAPA is no longer a certified bargaining representative, it does not owe a duty of fair representation to any pilots. *Dycus*, 615 F.2d at 827. By forcing USAPA to advocate for the Nicolau Award, the majority puts USAPA in a far more limited position than it would have been in even if the Nicolau Award had been implemented as the West Pilots wanted.

Moreover, even if USAPA were still a certified bargaining representative for the former US Airways Pilots, it would have had far greater leeway to craft its position in arbitration than the injunction will provide it. USAPA would still be free to suggest any proposal that "rationally promote[s] the aggregate welfare of the employees in the bargaining unit," *Rakestraw*, 981 F.2d at 1535, and its decisions would be "subject to the most deferential judicial review," *id.* at 1532. Instead, the majority instructs USAPA to become unwavering partisans of the Nicolau Award, forsaking all other concerns. On the other hand, the injunction

23

will have no restraining effect on any of the other participants in the McCaskill-Bond arbitration, including the West Pilots who, undoubtedly, will press for a Nicolau Award-type of seniority list.

Such a sweeping injunction also needlessly hamstrings USAPA's ability to put forward a position on the key question at issue in the arbitration: how to combine the US Airways seniority lists with the pre-merger American Airlines seniority list. The phrasing of the majority's instructions to the district court makes it unclear whether USAPA will be allowed to put forth a position on merging the lists at all, since doing so has nothing to do with "advocat[ing] the Nicolau Award." Maj. Op. at 55. If USAPA does try to put forward a position on integration with the pre-merger American pilots, its efforts will no doubt by hindered by concerns about whether any given position goes beyond advocating the Nicolau Award. And the arbitrators, knowing USAPA is being coerced by a court order, will have little reason take its suggestions seriously. The majority's injunction, which will effectively eliminate USAPA's ability to function as a significant participant in the seniority integration proceedings, is overbroad. This is especially true because the West Pilots will be a participant in the McCaskill-Bond arbitration free to press their case in favor of the Nicolau Award without restraint and without fear of any counterarguments being made by USAPA.

Setting aside the issues of tailoring and overbreadth, the injunction the majority imposes is an unwise judicial attempt to influence the McCaskill-Bond arbitration board. Regardless of what this court orders, the arbitration board will have the full and final power to craft the joint seniority list for the post-merger American Airlines on whatever basis it finds fair. And the arbitration board will be free to give Nicolau Award as much or as little weight as it sees fit. The fact that this court has forced USAPA to promote the Nicolau Award will not serve to make the Nicolau Award seem any more or less appropriate to the arbitration board. Thus, there is ultimately very little to be gained from the majority's injunction.

On the other hand, the injunction has the potential to work significant mischief. APA designated three merger committees to participate in the upcoming arbitration: USAPA, a West Pilot merger committee, and a merger committee representing the pilots of the pre-merger American Airlines. As the majority notes, APA likely intended the USAPA merger committee to represent the interests of the East Pilots. Maj. Op. at 53. By designating one merger committee to represent each distinct group of pilots, APA sought to "ensure that the interests of all pilots [would] be properly represented" in the seniority list integration proceedings. *In the Matter of the West Pilots' Request for a Merger Committee*, Preliminary

25

Arbitration Board Award at 16 (Jan. 9, 2015). This was more than a kind gesture; it was an effort by APA to comply with its legal obligation to make "provisions . . . for the integration of seniority lists in a fair and equitable manner." *Allegheny-Mohawk Merger*, 59 C.A.B. at 45.

By cutting off USAPA's speech rights, the majority upsets this balance. For all those pilots who were part of US Airways, but not the West Pilots, there will be no voice to represent them before the McCaskill-Bond arbitration board. Advocating a date-of-hire seniority list as a committee representing a specific group of affected pilots within a larger union cannot be equated, as the majority does, with acting as a certified bargaining representative subject to a duty of fair representation. There is simply no justification for such judicial interference with the McCaskill-Bond proceedings, the aim of which is to give all affected pilot groups a voice in the proceeding and to reach a fair and equitable resolution of the pilot seniority issue.[8]

**IV.**

---

[8]   The majority-injunction's interference with the McCaskill-Bond arbitration proceeding is broad. In effect, it ties the hands of the arbitration board as to the scope of the evidence it can hear; it bars the arbitration board from hearing any evidence of the East Pilots position. Such judicial interference with an arbitration board's pre-trial decision on the scope of evidence it chooses to hear is unprecedented.

Because USAPA is no longer certified to represent the US Airways pilots, including the West Pilots, under the Railway Labor Act, this court cannot give the West Pilots the relief they seek in their FAC; this case is therefore moot. Regardless, the district court's finding that USAPA included Paragraph 10(h) in the MOU to prevent a counterproductive struggle is not clearly erroneous, and the district court's decision on Plaintiffs' duty of fair representation claim should be affirmed. Instead, the majority imposes a speech-restricting injunction made of whole cloth that has no legal basis, and may ultimately do more harm than good.

I respectfully dissent from Parts III, IV, and the portion of Part V directed to the duty of fair representation claim and to the award of attorneys' fees.